Filed 4/14/21  P. v. Didyavong CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D077933 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD142894) |
| BOUNTHANOM DIDYAVONG, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Reversed and remanded with directions.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

In 2001, a jury convicted Bounthanom Didyavong of first degree murder (Pen. Code,[1] § 187, subd. (a)). Didyavong was sentenced to an indeterminate term of 25 years to life in prison. Didyavong appealed and this court affirmed the conviction in an unpublished opinion. (*People v. Didyavong* (July 30, 2002, D037601) [nonpub. opn.]).[2]

In May 2019, Didyavong filed a pro. per. petition for resentencing under section 1170.95. The court appointed counsel, received briefing, and considered the record of conviction and this court's previous opinion. The court concluded Didyavong had failed to state a prima facie case for relief and denied the petition by written order.

Didyavong filed a timely notice of appeal.

Didyavong contends the court erred in denying the petition for resentencing because the court engaged in impermissible judicial fact-finding. The Attorney General agrees the court erred and argues this court should reverse the order denying the petition and remand for further proceedings consistent with section 1170.95.

After reviewing the statute and the record of the original trial, we are satisfied the parties have correctly analyzed the record and we accept the People's concession.

---

[1]     All further statutory references are to the Penal Code.

[2]     We granted the People's request to take judicial notice of this court's records in case No. D037601.

2

STATEMENT OF FACTS

The facts of the underlying offense are set forth in our previous opinion. The parties have utilized those facts in their discussion. We will adopt the facts as set forth in the respondent's brief.[3]

"On the evening of September 12, 1998, Ryan [L.] had a party at his residence on Bell Bluff Avenue in San Diego. Roughly 25 to 30 teenagers were at the party. About 11:30 p.m., a number of the teenagers were outside when [O.I.] passed them in his white Honda Civic hatchback. Jordan [W.], who had been drinking, was angered because he perceived that the Honda swerved toward the group and he kicked the front passenger side fender of the car as it passed. Mistakenly thinking he knew the driver, [Jordan] ran after the car, which stopped briefly and then drove off.

"About an hour later, [O.I.] drove the Honda back to Bell Bluff Avenue, followed by several other vehicles, and stopped in the middle of the street. Fifteen to twenty Asian men got out of the cars and a tall one, wearing a white shirt and baggy blue pants and sporting a distinctive hairstyle, took a small baseball bat out of the trunk of the Honda. Six or seven of the Asians surrounded partygoer David [D.], who was across the street smoking a cigarette, and attacked him. The rest of the Asian group formed a shield around the attackers, who were holding [David] down on the ground; one of the attackers used a miniature baseball bat, and another used a lead pipe, to beat [David].

"When the other teenagers started coming outside to see what was happening, one of the Asians challenged them, asking if anyone else 'wanted

---

[3] We do so in nearly verbatim fashion except to sometimes use first names and/or initials in naming third parties involved in the subject offenses to protect privacy as much as possible.

3

any of what they had.' No one responded. As the attackers held [David] down, one of the Asians at the center of the group fired five or six gunshots, causing the partygoers to scatter or seek cover. The assailant with the bat hit [David], who was lying in the street, in the head one last time as the rest of the Asians ran back to their cars. The attacker rejoined the rest of his group, which then drove away.

"[David] was unconscious and did not respond to efforts by the partygoers, or subsequent attempts by paramedics, to revive him. He was transported to a hospital, where he was pronounced dead at 1:27 a.m. An autopsy showed that he died from two gunshot wounds to the chest that damaged his heart, lungs and liver. He also suffered a third gunshot wound, a skull fracture and six puncture wounds consistent with having been stabbed with a Phillips-head screwdriver. Police investigating the scene found a metal pipe in the grass, a baseball bat hidden in the bushes and five shell casings on the ground.

"Shortly thereafter, the police arrested [S.R.], [P.P.] and Didyavong, who were affiliated with an Asian gang called the OKB, in connection with the incident. Officers interviewed [S.R.] and [P.P.], who admitted their participation in the attack and also indicated that Didyavong had been involved. (The evidence of these interviews was not introduced at Didyavong's trial.) Thereafter, the police put Didyavong and [S.R.] together in a holding cell at the police station. The men had a conversation, surreptitiously recorded by police, in which Didyavong urged [S.R.] to recant [S.R.'s] prior statements to the police implicating him in the incident.

"Several days after the incident, a friend of [David]'s who witnessed the attack gave a description of the bat-wielding assailant to the police. The witness subsequently chose Didyavong's photo, taken at the time of arrest,

4

from an 18-item photographic lineup and identified Didyavong based on his clothing, physical build and hairstyle as the person who used the bat. The witness also chose a photograph of OKB member [Ph.P.], who he identified as one of the people that he saw get out of the Honda.

"In June 1999, the District Attorney charged Didyavong with murder. (Prosecutors also charged [Ph.P.], [O.I], [S.R.], [P.P] and several others with murder in connection with the attack.) [P.P.] reached an agreement with prosecutors to plead guilty to voluntary manslaughter arising out of [David]'s death and to testify truthfully in the criminal trials against the other defendants, in exchange for a maximum sentence of 11 years in prison. Although he had repeatedly lied to police, investigators and his own attorney about the incident, he decided to provide truthful testimony because he felt badly about what had happened.

"At Didyavong's trial, [P.P.] testified that on the evening of the attack, he was 'hanging out' by a canyon with several other members and affiliates of the OKB or a closely allied gang known as the Oriental Mobster Crips (OMC). [O.I.], who was driving his Honda Civic, stopped to tell the group that a white guy had kicked his car and said '[l]et's go get him.' Most of the group got into five cars and followed Inthavong to Bell Bluff Avenue. [P.P.] drove Didyavong and Didyavong's cousin in his car. [P.P.] testified that he believed that the group was going to Bell Bluff Avenue only for a fistfight; however, he admitted that he had a gun in the glove compartment of his car for safety reasons. He testified that [S.R.] and [Ph.P.] were the only other members of the group who knew about the gun.

"When the group arrived at Bell Bluff Avenue, [O.I.] got out of his car and hit [David]. Shortly thereafter [Ph.P.], Didyavong and two or three others joined in the attack, kicking and beating [David], while the others

5

stood around. [Ph.P.] separated from the attackers and asked [P.P.]where the gun was; [P.P.] responded, 'you know where it is.' [Ph.P.] retrieved the gun from [P.P.]'s car, approached the group of attackers as they were beating [David], shot [David] three times and then fired several more shots at the other partygoers. The group ran back to the cars and left.

"San Diego Police Department Gang Detective Michael Gallivan testified for the prosecution as an expert on Asian gangs, as follows: Based on Didyavong's attire on the night of the attack (which was consistent with OKB gang colors) and his past affiliations, it appeared that he was an OKB member. Respect is very important to the OKB and the OMC. If a person showed disrespect to a member of these gangs, the gang would feel compelled to retaliate in some fashion, often a violent confrontation, because a failure to respond would be seen as a sign of weakness. If a person kicked an OKB gang member's car, this would be a sign of disrespect, or a challenge, that would require a response. The people who went along with the gang member would be expected to participate in the response in some manner, either through direct involvement or support through their presence at the scene. A beating of the type involved here, including the use of weapons, was a typical gang response to the perceived disrespect that had been shown, although an attack resulting in a death would be a 'severe' response and one that 'doesn't happen every day.'

"In his defense, Didyavong called retired professor emeritus Malcolm Klein, who testified that Asian gang members are most commonly involved in minor offenses (such as theft, vandalism and drugs), rather than more serious offenses (such as robbery, auto theft, rape or murder). Dr. Klein also testified that a shooting would not be an expected response to someone having kicked a gang member's car and that it would be inappropriate to

6

expect that an assault would result in a homicide.  Didyavong's father testified that he did not recognize the shirt his son was wearing at the time of his son's arrest."

## DISCUSSION

The trial court's task at the initial review stage of a petition under section 1170.95 is not a fact-finding process.  The court may review readily available facts from the record, including the opinions of appellate courts that have reviewed the underlying case.  (*People v. Drayton* (2020) 47 Cal.App.5th 965, 982; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 329, review granted Mar. 18, 2020; S260493.)  A court may deny relief where the available facts establish as a matter of law that the petitioner in not eligible.  (*People v. Garcia* (2020) 57 Cal.App.5th 100, 116, review granted Feb. 10, 2021, S265692.)

In this case, the record does not establish lack of eligibility as a matter of law.  Didyavong could have been the actual killer, an active aider and abettor, or an aider and abettor to a battery that had murder as a natural and probable consequence.  Our previous opinion did not establish as a matter of law that Didyavong was not convicted as a natural and probable consequences of aiding a gang battery.  We simply held that there was sufficient substantial evidence in the record to support the conviction under the law regarding murder as it existed at the time of trial.

To the extent the court concluded Didyavong's participation in the offense rendered Didyavong ineligible for relief, that conclusion was based on the factual inferences drawn by the court.  Such determination of fact at this beginning stage of review of the petition was not appropriate.  It must await a further evidentiary hearing after the court issues an order to show cause.

## DISPOSITION

The order denying Didyavong's petition for resentencing under section 1170.95 is reversed. The case is remanded to the trial court with direction to issue an order to show cause and to conduct such further proceedings as required by statute.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


GUERRERO, J.

8